## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**ACE EUROPEAN GROUP, LIMITED,**

            **Plaintiff,**

                                   **Case No. 2:12-CV-1214**
                                   **JUDGE SMITH**
    **v.**                              **Magistrate Judge Deavers**

**ABERCROMBIE & FITCH CO.,** *et al.*,

            **Defendants.**

_____

**ABERCROMBIE & FITCH CO.,**

            **Plaintiff,**

                                   **Case No. 2:11-CV-1114**
                                   **JUDGE SMITH**
    **v.**                              **Magistrate Judge Deavers**

**ACE EUROPEAN GROUP, LIMITED,**

            **Defendant.**

### OPINION AND ORDER

      This matter is before the Court on Plaintiff Abercrombie & Fitch Co.'s ("Abercrombie")

Motion for Partial Judgment on the Pleadings (Doc. 47 in case No. 11-cv-1114), and Defendant

ACE European Group Limited's ("ACE") Cross-Motion for Judgment on the Pleadings (Doc. 57

in case No. 11-cv-1114).  These motions are fully briefed and ripe for review.  For the reasons

that follow, the Court **GRANTS** Abercrombie's motion and **DENIES** ACE's motion.

**I.**      **Background**

      This is an insurance coverage dispute between Abercrombie and ACE.  Abercrombie is a

Delaware corporation with its principal place of business in New Albany, Ohio.  ACE is a foreign company domiciled in the United Kingdom and registered to sell surplus lines insurance policies in Ohio.  In exchange for the premium payment, ACE issued to Abercrombie the Safeonline Advertisers and Internet Liability Policy (the "Policy").  Hollister Co. ("Hollister") is a company affiliated with Abercrombie and is a named insured under the Policy.  The Policy provided coverage from September 1, 2009 until September 1, 2010.

In 2009, Abercrombie conducted a nationwide Christmas gift card promotion, offering a $25 gift card to consumers who purchased a designated amount of merchandise.  According to Abercrombie, the promotional gift cards expired and had their balance voided out on January 30, 2010.  Some of the gift cards issued in connection with the promotion, however, had the words "no expiration date" imprinted on them while others had no printed information regarding an expiration.

In the summer of 2010, consumers brought two class-action complaints against Abercrombie arising from their inability to use the promotional gift cards after January 30, 2010.  The first-filed lawsuit, styled *GS Tiffany Boundas and Dorothy Stojka v. Abercrombie* ("Boundas Action"), was filed in an Illinois state court on June 8, 2010, and was subsequently removed to the Northern District of Illinois.  The Boundas Action plaintiffs allege that Abercrombie committed breach of contract when it voided the gift cards on January 30, 2010.  The Boundas Action plaintiffs also alleged that Abercrombie violated the Ohio Consumer Sales Practices Act, Ohio Revised Code § 1345.01 *et seq.*, by engaging in unfair and deceptive acts and practices, including misrepresenting material facts to the plaintiffs in relation to the gift card promotion.  Particularly, the Boundas Action plaintiffs alleged that Abercrombie engaged in unfair and

deceptive acts and practices by "stating that the subject of a consumer transaction, the Gift Cards, had a use or benefit of not expiring, but imposing an expiration date on them; and . . . stating that the subjects of a consumer transaction, the Gift Cards, were of a particular standard, non-expiring, but imposing an expiration date on them."  (Boundas Compl. ¶ 47).  The two Ohio Consumer Sales Practices Act claims in the Boundas Action were dismissed in May 2011.  *See Boundas v. Abercrombie & Fitch Stores, Inc.*, No. 10 C 4866, 2011 WL 1676053 (N.D. Ill. May 2, 2011) (granting Abercrombie's Rule 12(b)(6) motion to dismiss as to the Ohio Consumer Sales Practices Act claims, but denying the motion as to the two breach of contract claims).

The second-filed lawsuit, styled *Kerry White v. Abercrombie & Fitch, Hollister, and The Limited*, Case Number BC 444368 ("White Action"), was filed in the Superior Court of the State of California for the County of Los Angeles Central District.  A First Amended Complaint was filed in which Hollister, an Abercrombie subsidiary and a separately named insured under the Policy, is the only remaining defendant.  White, individually and on behalf of a purported class, alleges that he purchased $84.82 worth of merchandise at Hollister and received a $25 gift card, which he gave to his daughter.  When his daughter attempted to redeem the gift card at Hollister on February 7, 2010, she was told it had expired.  White alleges that the gift card did not have an expiration date imprinted on it.  The White Action includes claims for declaratory relief and for violation of the California Consumer Legal Remedies Act.

As it relates to the claim for declaratory relief, White requests an order enjoining Hollister from refusing to redeem any gift card after a non-specified expiration date.  White alleges that the requested declaratory judgment would require Hollister "to modify [its] behavior to conform to the law on a class and public-wide basis, to wit, [Hollister] would be compelled to

3

cease issuing gift cards without expiration dates as required by law and would be compelled to comply with the provisions of California Civil Code Section 1749.5, and redeem all such gift cards." (White Compl. ¶ 32).  As to the California Consumers Legal Remedies Act claim, White alleges that Hollister violated Section 1770(a)(5) of the Act by wrongfully representing that "goods . . . have . . . characteristics . . . which they do not have."  (*Id.* ¶ 35).

During the Policy period, Abercrombie sought coverage from ACE under the Policy for the Boundas and White Actions.  Based on its review of the allegations set forth in the Boundas and White complaints, ACE denied coverage.

In November 2011, Abercrombie filed suit against ACE in the Court of Common Pleas for Franklin County, Ohio. ACE subsequently removed the action to this Court, and the matter was assigned Case No. 2:11-cv-1114.  Abercrombie seeks declaratory relief regarding the terms of the policy and asserts state-law breach of contract and bad faith claims arising out of ACE's denial of coverage for the Boundas and White Actions.  Specifically, Count I of the Complaint alleges breach of contract for ACE's failure to provide a defense in the Boundas Action, Count II alleges breach of contract for ACE's failure to provide a defense in the White Action.  Count III alleges bad faith by ACE in connection with its decision not to provide a defense in the Boundas Action. Count IV alleges bad faith by ACE in connection with its decision not to provide a defense in the White Action.  Count V seeks a declaratory judgment that all damages that may be recovered in the Boundas Action on the plaintiffs' claim for consumer fraud are covered by the Policy.  Lastly, Count VI of the Complaint seeks declaratory judgment that all damages that may be recovered in the White Action on the plaintiffs' claim for consumer fraud are covered by the Policy.

4

Approximately five hours after Abercrombie filed its lawsuit against ACE, ACE filed suit against Abercrombie in the Northern District of Illinois, seeking declaratory relief. The essential substance of ACE's lawsuit against Abercrombie is that the Policy does not afford any coverage for defense or indemnity to Abercrombie for the Underlying Lawsuits, and that ACE has not breached the insurance contract or acted in bad faith as it relates to its claims handling and denial of coverage. ACE also moved this Court to transfer Case No. 2:11-cv-1114 to the Northern District of Illinois. This Court denied ACE's motion to transfer venue. Shortly after this Court denied ACE's motion to transfer, the Northern District of Illinois transferred ACE's lawsuit to this Court, and the matter was assigned Case No. 2:12-cv-1214.

In January 2012, ACE filed its Answer to Abercrombie's Complaint and a Counterclaim for Declaratory Judgment. The Counterclaim requests the following judicial declarations: that ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits because the claims are for breach of contract and are not within the scope of the Policy (Count I); ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits because the Underlying Complaints do not seek insurable damages under applicable law (Count II); ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits because there is no coverage for intentional wrongful conduct under the Policy and because public policy precludes coverage for such conduct (Count III); ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits because Exclusion (o) of the Policy precludes coverage (Count IV); ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits because Exclusion (n) of the Policy precludes

coverage (Count V); ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits because Abercrombie failed to satisfy conditions precedent to coverage (Count VI); ACE has and had no duty to defend or indemnify Abercrombie in connection with the Underlying Lawsuits to the extent that additional provisions of the Policy and/or applicable law preclude or limit coverage (Count VII); ACE has not breached the insurance contract with Abercrombie due to ACE's denial of coverage or any other action or inaction associated therewith (Count VIII); and ACE acted in good faith and complied with applicable law in connection with its denial of coverage for Abercrombie and its handling of the coverage request (Count IX).

On December 14, 2011, a third class action arising from Abercrombie's gift card promotion was filed by Beth Seaver against Abercrombie in the Court of Common Pleas for Cuyahoga County, Ohio ("Seaver Action") (the Seaver, Boundas, and White Actions are collectively referred to as the "Underlying Lawsuits").  Seaver alleges that in December 2009 Abercrombie offered to provide customers with a $25 gift card for each $100 worth of Abercrombie merchandise purchased.  Seaver purchased approximately $300 worth of merchandise at an Abercrombie store and received $75 worth of gift cards.  Seaver alleges that the back of the gift cards stated that there was "[n]o expiration date."  (Seaver Compl. ¶ 11). Seaver also alleges that Abercrombie voided the gift cards on January 30, 2010.

Seaver, individually and on behalf of a purported class, alleges a breach of contract claim and a claim under the Ohio Consumer Sales Practices Act.  As to the breach of contract claim, Seaver alleges that Abercrombie formed a contract with Seaver and each member of the putative class "when it delivered to them the Gift Cards in consideration for their purchase of at least

$100 worth of Abercrombie's merchandise." (*Id.* ¶ 26).  Seaver further alleges that Abercrombie breached these contracts "when it unilaterally voided the Gift Cards by eliminating the remaining credit on said cards, violating the valid and enforceable term stating that the Gift Cards had 'No expiration date.'" (*Id.* ¶ 27).  In support of the Ohio Consumer Sales Practices Act claim, Seaver alleges that Abercrombie engaged in unfair and deceptive acts and practices by, inter alia, stating "that the . . . Gift Cards, had a use or benefit of not expiring, but imposing an expiration date on them." (*Id.* ¶ 34).

On January 5, 2012, Abercrombie tendered the Seaver Action to ACE for coverage.  In February 2012, the Seaver Action was transferred to the Court of Common Pleas for Franklin County, Ohio.  In April 2012, ACE informed Abercrombie of its decision to deny coverage for the Seaver Action.

As a result of the filing of the Seaver Action and ACE's denial of coverage, Abercrombie moved for leave from this Court to supplement its Complaint in order to add claims against ACE arising from ACE's refusal to provide coverage for the Seaver Action.  The request was granted, and Abercrombie filed its Supplemental Complaint in September 2012, which added Counts VII and VIII.  Count VII alleges breach of contract for ACE's failure to provide a defense in the Seaver Action.  Count VIII seeks declaratory judgment that all damages that may be recovered in the Seaver Action on the plaintiffs' claim for consumer fraud are covered by the Policy.  ACE filed an Answer to Abercrombie's Supplemental Complaint and a Counterclaim for Declaratory Judgment.  The Counterclaim filed in response to the Supplemental Complaint is substantively the same as the Counterclaim filed in response to the Complaint, except that it addresses the Seaver Action.

In October 2012, Abercrombie filed its Motion for Partial Judgment on the Pleadings.  In moving for partial judgment on the pleadings, Abercrombie asserts that it is entitled to judgment as a matter of law, as to liability only, on three of its claims for breach of contract: Counts I and II of the Complaint and Count VII of the Supplemental Complaint, as well as Counterclaims I through VIII, insofar as those claims relate to ACE's duty to defend Abercrombie in the Underlying Lawsuits.  Thus, Abercrombie moves for judgment on its breach of contract duty to defend claims (Counts I, II, and VII), but does not move for judgment on its bad faith duty to defend claims (Counts III and IV) or declaratory judgment duty to indemnify claims (Counts V, VI, and VIII).  Nor does Abercrombie move for judgment on Counterclaims I through VIII, insofar as those claims relate to ACE's duty to indemnify Abercrombie in the Underlying Lawsuits, or as to Counterclaim IX.  In November 2012, ACE filed its Cross-Motion for Judgment on the Pleadings.  ACE asserts that it is entitled to judgment as a matter of law on all of Abercrombie's claims as well as its counterclaims.  These motions are fully briefed and ripe for disposition.[1]

## II.      Rule 12(c) Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed-but early enough not to delay trial-a party may move for judgment on the pleadings."  It is well-settled that the standard of review for a motion for judgment on the pleadings under Rule 12(c) is the same as that used to address a motion to dismiss under Rule 12(b)(6).  *See, e.g., Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007); *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 11

---

[1] In March 2013, this Court administratively stayed Case Nos. 2:11-cv-1114 and 2:12-cv-1214, pending resolution of the motions for judgment on the pleadings.  The Court noted that following resolution of the pending motions, it will entertain motions on how best to proceed in the resolution of both cases most efficiently and in the interest of judicial economy (Doc. 70).

(6th Cir. 1987) (noting that where a Rule 12(b)(6) defense of failure to state a claim upon which relief may be granted is raised by a Rule 12(c) motion for judgment on the pleadings, the Court must apply the standard for a Rule 12(b)(6) motion).

Rule 12(b)(6) permits dismissal of a lawsuit for "failure to state a claim upon which relief can be granted."  A Rule 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it.  *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983).  The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim.  Consequently, a complaint will be dismissed pursuant to Rule 12(b)(6) only if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief.  *See Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978).  Rule 12(b)(6) must be read in conjunction with Rule 8(a) of the Federal Rules of Civil Procedure, which requires the complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief[.]"

A court, in considering a 12(b)(6) motion to dismiss, must "construe the complaint in the light most favorable to the plaintiff," accepting as true all the plaintiff's factual allegations.  *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  Although in this context all of the factual allegations in the complaint are taken as true, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

Furthermore, to survive dismissal pursuant to Rule 12(b)(6), a claim must contain

sufficient factual matter to "state a claim to relief that is plausible on its face." *Twombly*, at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 1950.  While a complaint need not contain "detailed factual allegations," its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, at 555.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.' " *Iqbal*, at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).  In the final analysis, the task of determining plausibility is "context-specific [and] requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

Accordingly, the Court will grant a motion for judgment on the pleadings if there is an absence of law to support a claim of the type made, or of facts sufficient to make a valid claim, or if on the face of the complaint there is an insurmountable bar to relief indicating that the plaintiff does not have a claim.  *Little v. UNUM Provident Corp.*, 196 F. Supp.2d 659, 662 (S.D. Ohio 2002) (Graham, J.) (citing *Rauch*).  Stated differently, "[f]or purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citations and quotation marks omitted).

## III.  Insurance Policy Construction under Ohio Law

The parties do not dispute that, under the express terms of the Policy, Ohio law governs the construction or interpretation of the Policy.  An insurance policy is a contract between the

10

insurer and the insured.  *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 125 (Ohio 2006).  Under Ohio law, "[t]he construction of written contracts . . . is a matter of law." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, paragraph one of the syllabus (Ohio 1978).  The party "seeking to recover on an insurance policy generally has the burden of proving a loss and demonstrating coverage under the policy." *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 418 N.E.2d 1381, 1383 (Ohio 1981).  An insurer bears the burden of proving the applicability of an exclusion in its policy.  *Continental Ins. Co. v. Louis Marx Co.*, 415 N.E.2d 315, 317 (Ohio 1980).

When a court is confronted with an issue of contractual interpretation, the court must give effect to the intent of the parties to the agreement.  *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).  The court must examine an insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy.  *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007) (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, paragraph one of the syllabus (Ohio 1987)).

Contract terms are to be given their plain and ordinary meaning.  *Gomolka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348 (Ohio 1982); *Alexander*, 374 N.E.2d at paragraph two of the syllabus ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.").  Technical terms will be given their technical meaning, unless a different intention is clearly expressed.  *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997).

"A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." *Kelly*, 509 N.E.2d at 413; *see Galatis*, 797 N.E.2d at 1261 (noting that it is well-settled Ohio law that when the language of a written contract is clear, an Ohio court may look no further than the writing itself to find the intent of the parties). An ambiguous provision in an insurance policy is one that has more than one reasonable interpretation. *Hacker v. Dickman*, 661 N.E.2d 1005, 1006 (Ohio 1996). But a provision is not ambiguous solely because it could have been more clearly drafted. *Milburn v. Allstate Ins. Co. Prop. & Cas.*, 2009 WL 3320557 (Ohio App. 10th Dist. Oct. 15, 2009) (citing *Rucker v. Davis*, 2003 WL 21404511 (Ohio App. 4th Dist. June 17, 2003)). "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Galatis*, 797 N.E.2d at 1261 (citing *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000)).

"Where exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." *Home Indemn. Co. of New York v. Plymouth*, 64 N.E.2d 248, paragraph two of the syllabus (Ohio 1945). Accordingly, in order for an insurer to defeat coverage through a clause in the insurance contract, it must demonstrate that the clause in the policy is capable of the construction it seeks to give it, and that such construction is the only one that can be fairly placed upon the language. *Andersen v. Highland House Co.*, 757 N.E.2d 329, 332 (Ohio 2001). The "insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear

and exact in order to be given effect." *Lane v. Grange Mut. Cos.*, 543 N.E.2d 488, 490 (Ohio 1989).

As to the issue of an insurer's duty to defend, which is a contractual obligation, it is often stated that an insurer's duty to defend is broader than and distinct from its duty to indemnify. *See e.g.*, *Socony–Vacuum Oil Co. v. Continental Cas. Co.*, 59 N.E.2d 199, paragraph one of the syllabus (Ohio 1945). When an insurer agrees to defend an insured against any claim alleging facts within coverage, even if groundless, false, or fraudulent, the insurer has an absolute duty to defend an action when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy. *Sanderson v. Ohio Edison Co.*, 635 N.E.2d 19, paragraph one of the syllabus (Ohio 1994); *see Motorists Mut. v. Trainor*, 294 N.E.2d 874, paragraph two of the syllabus (Ohio 1973) (noting that an insurance company has a duty to defend an action against its insured when the allegations of the complaint against the insured bring the action within the coverage of the insured's policy); *Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London*, 813 F. Supp. 576, 584 (N.D. Ohio 1993) ("the insurer must defend when the facts in the complaint arguably or potentially fall within the scope of the insurer's coverage"). Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the policy coverage. *Preferred Mut. Ins. Co. v. Thompson*, 491 N.E.2d 688, 690 (Ohio 1986).

An insurer need not, however, defend any action or any claims within the complaint when all the claims are clearly and indisputably outside of the contracted policy coverage. *Preferred Risk Ins. Co. v. Gill*, 507 N.E.2d 1118, 1123 (Ohio 1987); *see Erie Ins. Exchange v. Colony Dev. Corp.*, 136 Ohio App.3d 406 (Ohio Ct. App. 1999) ("Only if there is no possibility

of coverage under the policy based on the allegations in the complaint will the insurer not have a duty to defend the action.")

## IV.    Discussion

Abercrombie moves for judgment on the claims relating to ACE's duty to defend in the Underlying Lawsuits.  Abercrombie states that it is not moving for judgment on the pleadings as it relates to claims made in Case No. 2:11-cv-1114 not addressing ACE's duty to defend (such as ACE's duty to indemnify and whether ACE acted in bad faith).  By its motion, ACE generally asserts that it is entitled to judgment as a matter of law on all of the claims and counterclaims asserted in Case No. 2:11-cv-1114.

Abercrombie asserts that, while the issue of ACE's duty to defend is ripe for resolution because it can be resolved based on the allegations made in the Underlying Lawsuits, the issue of ACE's duty to indemnify is not ripe for resolution because it requires additional evidentiary and factual development.  *See Erie Ins. Exchange v. Colony Dev. Corp.*, 136 Ohio App.3d 406 (Ohio Ct. App. 1999) ("once a duty to defend is recognized, speculation about the insurer's ultimate obligation to indemnify is premature until facts excluding coverage are revealed during the defense of the litigation").  ACE's only challenge to this assertion is to cite case law indicating that where there is no duty to defend, there can be no duty to indemnify.  ACE does not contend that, should the Court find a duty to defend, the issue of indemnification necessarily can be resolved at this time.  In sum, the parties' arguments on the issue of ACE's indemnification obligation as to any liability incurred by Abercrombie have not been fully developed. Furthermore, it is possible that Abercrombie ultimately will prevail in the Underlying Lawsuits, thereby eliminating any necessity of having to decide the issue of indemnification.  In this sense,

14

addressing the requests for declaratory relief as to the issue of indemnification would be premature. Lastly, even though ACE generally asserts that it is entitled to judgment as to all claims, it recognizes that it is premature to decide, as a matter of law, whether it acted in bad faith in handling Abercrombie's claims for coverage. (Doc. 66, at 3, stating that "it is premature to seek any ruling as to whether ACE acted in good faith in denying Abercrombie's claims.").

Therefore, the issue currently before the Court concerns ACE's duty to defend Abercrombie under the Policy as it relates to the Underlying Lawsuits. The remaining issues will be resolved at a later time. As such, the Court will set forth the pertinent provisions of the Policy, outline the arguments of the parties as it relates to that language, and then analyze whether the allegations in the Underlying Lawsuits bring them within the Policy's coverage so as to require ACE to provide a defense for Abercrombie.

### A. Policy Language

Section I of the Policy, the "Insuring Agreement" Section, generally sets forth the terms of coverage for the Policy. However, that Section is not at issue here because the language contained therein was replaced by an amendment to the Policy. The Policy contains a "Privacy Breach and Privacy Regulations Breach Endorsement" ("Endorsement"), which by its express terms modifies and amends the Policy. The Endorsement provides, in pertinent part, as follows:

Section I Insuring Agreement, is deleted and replace[d] as follows;

We [the insurer] shall pay on your behalf all damages and claims expenses within the Limit of Liability in excess of your [the insured's] Deductible which you become legally obligated to pay as a result of any claim first made against you and notified by you to us in writing during the policy period or any Extended Reporting Period arising out of the following:

* * *

15

(j) notwithstanding anything contained within Exclusion (n), unfair competition, involving misuse of media communication, dilution, deceptive trade practices, civil actions for consumer fraud, false advertising or misrepresentation in advertising activities committed in the utterance, dissemination, gathering, acquisition, or obtaining of matter by your or with your permission solely in your performance of advertising.

(Doc. 1-2, Policy at 31).  For the purpose of the Endorsement, unfair competition "means the misuse of a literary, artistic, audio-visual, musical, dramatic, or informational property right." (*Id.* at 33).  "Claims expenses" includes "fees charged by a lawyer(s) designated by us [ACE] to defend any claim" and other defense costs.  (*Id.* at 7).

The Policy also expressly provides that it is "[ACE's] duty to defend a claim against you [Abercrombie] even if such claim is groundless or fraudulent[.]"  (*Id.* at 6).  The Policy defines a "claim" in pertinent part as "a civil proceeding for damages commenced by the filing of a complaint[.]" (*Id.* at 31).  And the Policy generally defines "damages" to include a "compensatory monetary judgment, award or settlement;" but not, *inter alia*, "damages pursuant to federal, state or local statutory law other than compensatory;" "return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided;" "restitution;" "disgorgement of profits;" or "any amounts owed under any express or implied contract[.]"  (*Id.* at 8).

The Policy sets forth various exclusions from coverage in Section IV, "Exclusions."  The "Exclusions" provision of the Policy provides in pertinent part:

We [the insurer] shall not be liable for any damages or claims expenses directly or indirectly arising out of or in any way attributable to;

(a) any claim made against you [the insured] arising out of any, willful, malicious, fraudulent, dishonest or criminal act; However, notwithstanding the foregoing, the insurance afforded by this Policy shall apply to claims expenses incurred in defending any such claim or circumstance which might lead to a claim, but shall

not apply to any damages which you might become legally obligated to pay, however upon the determination by a court, jury, or arbitrator, we will have the right to recover those claims expenses incurred from those parties found to have committed criminal, dishonest, fraudulent or malicious acts;

* * *

(h) any liability assumed under any contract or agreement including any breach of express warranty or guarantee, except and to the extent you would have been liable in the absence of such contract or agreement, except this exclusion does not apply to liability assumed under contract in respect of a media communication;

* * *

(n) any actual or alleged antitrust, restraint of trade, unfair competition, false, deceptive or unfair business practices, violation of consumer protection laws or false or deceptive advertising including violations of any local, state or federal laws regarding the aforementioned conduct;

(o) coupons, prize discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount[.]

(Doc. 1-2, Policy at 10-11).

### B.     Arguments of the Parties

ACE argues that it has no duty to defend Abercrombie in connection with the lawsuits resulting from the Christmas 2009 gift card promotion.  ACE argues that the requested coverage in connection with the Underlying Lawsuits is precluded for multiple reasons.  First, ACE argues that Abercrombie is not entitled to coverage under paragraph (j) of the Endorsement.  According to ACE, coverage under paragraph (j) is limited to claims arising out of unfair competition, which is defined as the "misuse of a literary, artistic, audio-visual, musical, dramatic, or informational property right."  ACE asserts that coverage under paragraph (j) does not extend to deceptive trade practices and/or consumer fraud, unless the claims arise out of the misuse of one of the identified property rights.  Thus, ACE reasons that there is no coverage under paragraph

(j) because the Underlying Lawsuits do not assert any claims arising out of the misuse of one of the identified property rights. In a related argument, ACE contends that the Underlying Lawsuits are not within the scope of the Endorsement in view of the title of the Endorsement, "Privacy Breach and Privacy Regulations Breach Endorsement," and considering that Abercrombie's application for coverage focuses on Abercrombie's handling, storage, and protection of data. ACE reasons that because the allegations in the Underlying Lawsuit do not allege any privacy breach claims or relate to the handling, storage, and protection of data, there is no coverage under the Endorsement. Second, ACE argues that the Underlying Lawsuits do not seek covered "damages" because the plaintiffs in those cases seek damages caused by Abercrombie's alleged failure to honor existing contractual obligations. ACE argues that damages resulting from Abercrombie's failure to honor contractual obligations are expressly excluded from coverage by the Policy. Third, ACE argues that a finding of coverage under the Policy would violate public policy because Abercrombie's decision to breach its contractual obligations in relation to the gift cards is uninsurable. Finally, ACE argues that exclusions under the Policy preclude coverage. In particular, ACE contends that paragraphs (h), (n), and (o), of the Exclusions section of the Policy each independently preclude coverage.

Conversely, Abercrombie argues that coverage is provided under paragraph (j) of the Endorsement, and that no exclusion applies. Abercrombie reasons that paragraph (j) extends coverage to consumer fraud lawsuits, the underlying lawsuits present claims for consumer fraud, and therefore it is entitled to a defense in the Underlying Lawsuits. Abercrombie argues that the Underlying Lawsuits seek covered "damages" because the lawsuits seek compensatory damages pursuant to consumer fraud statutes, not solely damages for breach of contract. Lastly,

18

Abercrombie argues that the exclusions cited by ACE do not apply here.

**C.      Analysis**

For Abercrombie to be entitled to a defense in the Underlying Lawsuits, the allegations in the complaints in those lawsuits must potentially or arguably fall within the liability insurance coverage of the Policy.  Because it is Abercrombie's asserted basis for coverage, the Court first will determine whether coverage is potentially or arguably afforded under paragraph (j) of the Endorsement.  At issue is whether paragraph (j) only provides coverage for types of "unfair competition" claims, or whether the language extends coverage to other business-related claims without regard to whether they involve unfair competition, as that term is defined for the purpose of the Endorsement.  Resolution of this issue concerns the use of the word "involving" and the comma that immediately precedes it in paragraph (j).  That is, the parties disagree over whether the term "unfair competition" is only modified by the phrase "involving misuse of media communication" (Abercrombie's interpretation) or whether the entire list that follows relates back to, and operates to modify, the term unfair competition (ACE's interpretation).

The Court finds that ACE's interpretation of paragraph (j) is unreasonable.  The words after "misuse of media communication" are not connected to the word "involving."  Otherwise, the language becomes nonsensical.  As interpreted by ACE, the Endorsement indicates that the insurer shall pay on the insured's behalf "claims expenses . . . arising out of . . . unfair competition, involving . . . civil actions for consumer fraud[.]"

Abercrombie's interpretation, however, is reasonable.  The paragraph sets forth separate legal claims, including unfair competition involving misuse of media communication, dilution, deceptive trade practices, and civil actions for consumer fraud.  The language of the

Endorsement could have been more clearly written. For example, the comma before the word "involving" could have been omitted, or semicolons could have been used to separate each type of claim. Nonetheless, a lack of perfect clarity does not render the provision ambiguous. Furthermore, ACE's reference to the title of the Endorsement and Abercrombie's application for coverage is unavailing. Neither the title of the Endorsement nor the substance of the application for coverage alter the unambiguous language of the Endorsement. Therefore, the Court finds that claims expenses arising from civil actions for consumer fraud are covered under paragraph (j).

ACE argues that there is no coverage here because public policy and the language of the Policy precludes coverage for breach of contract, and the allegations in the Underlying Lawsuits are rooted in Abercrombie's alleged breach of contractual obligations to consumers. Exclusion (h) of the Policy precludes coverage for "any damages or claims expenses directly or indirectly arising out of or in any way attributable to . . . any liability assumed under any contract or agreement including any breach of express warranty or guarantee[.]" And the Policy's definition of damages excludes "any amounts owed under any express or implied contract." Because the Policy expressly excludes coverage for breach of contract claims, it is unnecessary to determine whether Ohio courts have determined that, as a matter of public policy, an insurance policy may not provide coverage for breach of contract claims. Although ACE is correct that the Policy precludes coverage for breach of contract claims, it incorrectly applies this rule to Abercrombie's request for a defense in the Underlying Lawsuits.

ACE asserts that the consumer fraud claims in the Underlying Lawsuits "rely on the fact that Abercrombie breached its Gift Card contracts." (Doc. 66, p. 17-18). Thus, ACE reasons

that all claims in the Underlying Lawsuits "arise out of" Abercrombie's alleged failure to honor

its contractual obligations.  The Court is not persuaded by this reasoning.  Even though breach of

contract claims are not covered under the Policy, this fact does not lead to the conclusion that the

consumer fraud claims are also precluded from coverage.  ACE incorrectly characterizes the

Underlying Lawsuits as simply alleging breach of contract and that any additional allegation is

derivative of that claim.  Indeed, the Underlying Lawsuits allege that Abercrombie breached

contractual obligations as it relates to the gift card promotion.  But the Underlying Lawsuits also

allege that Abercrombie violated consumer protection statutory law based on its conduct in

connection with the gift card promotion.  Furthermore, the *Boundas* and *Seaver* plaintiffs

requested compensatory damages in connection with their Ohio Consumer Sales Practices Act

claims, and the *White* Complaint alleges a violation of the California Consumers Legal Remedies

Act, which allows for recovery of actual damages.

The breach of contract and consumer fraud claims are legally distinct, even though the

underlying factual allegations largely parallel each other.  As noted by ACE, the substance of the

allegations in the Underlying Lawsuits must be considered in determining whether a duty to

defend is triggered.  Thus, the Court must look beyond the label placed on the claims by the

plaintiffs.  Contrary to ACE's suggestion, however, an examination of the actual substance of the

complaints in the Underlying Lawsuits reveals that the plaintiffs set forth a factual basis for the

alleged consumer fraud, in addition to alleging breach of contract.  The consumer fraud claims

are not somehow absorbed into the breach of contract claims for the purpose of determining the

applicability of ACE's duty to defend under the Policy.

ACE also argues that Exclusions (n) and (o) independently preclude coverage in this

case.  The Court disagrees.  Exclusion (n) precludes coverage for "any damages or claims expenses directly or indirectly arising out of or in any way attributable to . . . any actual or alleged antitrust, restraint of trade, unfair competition, false, deceptive or unfair business practices, violation of consumer protection laws or false or deceptive advertising including violations of any local, state or federal laws regarding the aforementioned conduct."  Exclusion (n) is not operative here, however, based on the language of paragraph (j) of the Endorsement. The prefatory clause of Endorsement paragraph (j) states: "notwithstanding anything contained within Exclusion (n)[.]"  Thus, coverage under paragraph (j) is not limited, in any way, by Exclusion (n).  ACE argues that such an interpretation is absurd because it would render Exclusion (n) nugatory.  This argument is unavailing.  Paragraph (j) is contained in the Endorsement, which amends the base Policy.  The Endorsement demonstrates the parties' intent to amend the base Policy, including significantly limiting the scope of Exclusion (n).

ACE's contention that Exclusion (o) applies to the alleged conduct in the Underlying Lawsuits is also unavailing.  Exclusion (o) precludes coverage for "any damages or claims expenses directly or indirectly arising out of or in any way attributable to . . . coupons, prize discounts, prizes, awards, or any other valuable consideration given in excess of the total contracted or expected amount."  Abercrombie notes that Exclusion (o) does not contain the term "gift cards."  While Abercrombie is correct that Exclusion (o) does not expressly refer to "gift cards," this does not end the analysis because the Exclusion contains a catch-all.  In this regard, ACE argues that all allegations and claims in the Underlying Lawsuits arise out of "valuable consideration given in excess of the total contracted or expected amount." ACE contends that the gift cards were given "in excess of the total contacted or expected amount."  But ACE's

contention is not consistent with the allegations of the Underlying Lawsuits.  The plaintiffs in the Underlying Lawsuits allege that the gift cards were given as part of a promotion, suggesting that the consumers expected to receive a gift card, if a certain amount of merchandise was purchased. As such, the gift cards given as part of the promotion cannot be categorically characterized as "valuable consideration given in excess of the total contracted or expected amount."  Therefore, Exclusion (o) does not apply to preclude ACE's duty to defend.

For these reasons, the Court finds that Abercrombie was and is entitled to a defense in the Underlying Lawsuits, and ACE breached its contractual obligation to provide the defense.

## V.     Conclusion

Based on the foregoing, the Court **GRANTS** Abercrombie's Partial Motion for Judgment on the Pleadings and **DENIES** ACE's Motion for Judgment on the Pleadings.  Abercrombie is entitled to judgment as a matter of law, on the issue of liability, as to Counts I, II, and VII of the Complaint, and as to Counts I through VIII of ACE's Counterclaim, insofar as ACE's counterclaims relate to its duty to defend.  All other claims remain pending.

The Clerk shall remove Documents 47 and 57 in Case No. 2:11-cv-1114 from the Court's pending motions list.

**IT IS SO ORDERED.**

  *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**